UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
LAFAYETTE DIVISION

| | |
|---|---|
| KEVIN D. MILLER, )<br>)<br>PLAINTIFF, )<br>)<br>VS. )<br>)<br>CAROLYN COLVIN, ACTING )<br>COMMISSIONER OF SOCIAL SECURITY, )<br>)<br>DEFENDANT. ) | CAUSE NO. 4:13-CV-16-RLM-APR |

OPINION and ORDER

Kevin D. Miller seeks judicial review of the final decision of the Commissioner of Social Security denying his applications for Disability Insurance Benefits and Supplemental Security Income benefits under Title II, 42 U.S.C. § 401 *et seq.*, and Title XVI, 42 U.S.C. § 1381 *et seq.*, of the Social Security Act respectively. The court has jurisdiction over this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c). For the reasons that follow, the court reverses and remands this case to the Social Security Administration for further proceedings consistent with this opinion.

I. BACKGROUND

Mr. Miller asserts that he has been disabled since November 15, 2011 due to mental impairments and pain in his knees. His applications for benefits were denied initially, upon reconsideration, and following an administrative hearing at which he was represented by counsel. At that hearing, the

administrative law judge heard testimony from Mr. Miller and vocational expert Thomas A. Gusloff. The ALJ found that Mr. Miller had some severe mental and physical impairments but didn't have an impairment or combination of impairments that met the severity of those impairments that are considered conclusively disabling. Further, the ALJ found that Mr. Miller couldn't perform his past work, but could perform certain jobs available in the national economy. The ALJ concluded that Mr. Miller wasn't disabled within the meaning of the Act. *See* 20 C.F.R. § 416.920(g). The Appeals Council denied review of the ALJ's decision, making the ALJ's decision the final determination of the Commissioner. The parties agree that the matter is properly before this court.

II. STANDARD OF REVIEW

The court must affirm the Commissioner's determination if it is supported by substantial evidence, 42 U.S.C. § 405(g); Scott v. Astrue, 647 F.3d 734, 739 (7th Cir. 2011), which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971); *see also* Jones v. Astrue, 623 F.3d 1155, 1160 (7th Cir. 2010). The court can't re-weigh the evidence, make independent findings of fact, decide questions of credibility, or substitute its own judgment for that of the Commissioner, Simila v. Astrue, 573 F.3d 503, 513 (7th Cir. 2009), but in reviewing the ALJ's conclusions, "[t]he court will

conduct a critical review of the evidence, considering both the evidence that supports, as well as the evidence that detracts from, the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." Briscoe v. Barnhart, 425 F.3d 345, 351 (7th Cir. 2005). The ALJ isn't required "to address every piece of evidence or testimony presented, but must provide a 'logical bridge' between the evidence and the conclusions so that [the court] can assess the validity of the agency's ultimate findings and afford the claimant meaningful judicial review." Jones v. Astrue, 623 F.3d 1155, 1160 (7th Cir. 2010).

III. DISCUSSION

The Social Security Administration uses a sequential five-step analysis to determine if a claimant is disabled. *See* 20 C.F.R. § 416.920. The first step considers whether the claimant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses a claimant's residual functional capacity and ability to engage in past relevant work. If a claimant who can engage in past relevant

work isn't disabled. The fifth step assesses the claimant's RFC, as well as his age, education, and work experience to determine whether the claimant can engage in other work. If the claimant can engage in other work, he is not disabled. *See* Craft v. Astrue, 539 F.3d 668, 673-674 (7th Cir. 2008).

Using the standard five-step evaluation for determining disability, the ALJ found that although Mr. Miller suffered from a post-surgery left knee, a torn meniscus in his right knee, osteoarthritis in both knees, a schizoaffective disorder, and cannabis dependence, none of these severe impairments met the criteria of an impairment listed in Appendix 1 of the SSI Regulations (20 C.F.R. Part 404, Subpart P, Appx. 1). He then found that while Mr. Miller was unable to perform his past work as a carpenter, drywall applicator, siding applicator, or construction worker, he could perform a significant number of jobs available in the national economy.

Mr. Miller contends the ALJ committed a number of errors. Regarding his mental impairments, Mr. Miller argues the ALJ didn't properly address his GAF scores and should have obtained an updated medical opinion. Although these arguments aren't dispositive, the court finds the ALJ's conclusions regarding Mr. Miller's mental impairments aren't supported by substantial evidence. Thus, the court needn't consider Mr. Miller's arguments that the ALJ didn't explain the basis for the mental residual functional capacity assessment and didn't properly analyze the state agency doctor opinions, his physical residual functional capacity, or his credibility.

A. Step Three

As already noted, the ALJ recognized that Mr. Miller had been diagnosed with a schizoaffective disorder and cannabis dependence. Step three of the ALJ's analysis compared these mental health impairments to a list of conclusively disabling impairments. At this step, the ALJ relied on the following evidence: Mr. Miller's function report; a Disability Determination Bureau report of contact dated April 12, 2012; a Field Office disability report from February 28, 2012; and a report compiled in April 2012 by Raymond Bucar, Ph.D. who evaluated Mr. Miller for the Indiana Disability Determination Bureau. The ALJ determined that Mr. Miller had mild restrictions in his activities of daily living, moderate difficulties with social functioning, moderate difficulties with concentration, persistence, or pace, and no episodes of decompensation which had been of extended duration. The ALJ found that Mr. Miller had sufficient adaptability to maintain extensive daily activities and could function outside the home. Ultimately, the ALJ concluded the severity of Mr. Miller's mental impairments didn't meet or medically equal the criteria of a listing.

In the daily living section in particular, the ALJ noted that Mr. Miller didn't like to take and needed reminders to take his medication, took more time than usual to bathe and dress, was able to do laundry, clean, and wash dishes, and could prepare simple meals, drive a car, go shopping, pay bills, count change, and handle bank accounts. At an October 2011 appointment at the

Regional Mental Health Center, however, Mr. Miller reported that he was homeless. Mr. Miller again reported that he was homeless at a September 2012 appointment and explained that he couldn't go to a shelter because he was uncomfortable being around a lot of people. The ALJ's conclusion that Mr. Miller's mental impairments only mildly restricted his daily living activities is perplexing and lacks evidentiary support when a month before the hearing, Mr. Miller was homeless and living out of his truck.

B. Step Four

The fourth step assesses Mr. Miller's residual functional capacity and ability to engage in past relevant work.

*GAF Scores*

The Global Assessment of Functioning Scale measures psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness from 0 to 100, with 100 reflecting superior functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. 2000). A GAF score of 41-50 denotes: "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Id. A GAF score of 51-60 denotes: "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or

school functioning (e.g., few friends, conflicts with peers or co-workers)." Id. Mr. Miller's GAF scores, in chronological order, were as follows: 50 (2003); 45 (Apr. 2004); 51 (Nov. 2004); 45 (Aug. 10, 2006); 35-40 (Aug. 25, 2006); 55 (Aug. 28, 2006); 30-35 (Nov. 2006); 45 (Dec. 2006); 53 (Apr. 2011); 48 (Oct. 2011); 48 (Jan. 2012); and 50 (July 2012). Only the last two scores were from assessments after the onset date.

The ALJ acknowledged that Mr. Miller had been given GAF "scores of 40 and 50, thereby suggesting he would likely experience serious to major impairment in several areas." The ALJ further noted that GAF scores are an assessment of the claimant's functioning at a specific point in time and can change dramatically in a short period of time. The ALJ concluded that the GAF scores therefore provide "no indication of the claimant's overall level of functioning over an extended period" of time and are of "very little value in determining disability." Nevertheless, the ALJ "considered the claimant's GAF scores when assessing his residual functional capacity."

Mr. Miller argues that the ALJ's rejection of the GAF scores as probative evidence is error because GAF ratings are an important consideration in the disability evaluation process. He cites Campbell v. Astrue, 627 F.3d 299 (7th Cir. 2010), and Spiva v. Astrue, 628 F.3d 346 (7th Cir. 2010). In both cases, the ALJ erroneously ignored parts of the record, including the GAF scores, which suggested disability. 627 F.3d at 306-307; 628 F.3d at 351. The Commissioner cites Denton v. Astrue, 596 F.3d 419 (7th Cir. 2010), and

contends that the ALJ isn't required to consider GAF scores because a GAF score doesn't reflect a clinician's opinion of a claimant's functional capacity. Id. at 425. The Commissioner's assertion goes too far. Neither regulations nor case law require an ALJ to determine a claimant's disability based entirely on the GAF score, Denton v. Astrue, 596 F.3d at 425, but they also don't eliminate the ALJ's need to consider the evidence altogether. So, the ALJ can't ignore the GAF scores, but he doesn't have to base his findings entirely on them.

The ALJ acknowledged Mr. Miller's GAF scores and that the scores in the record suggest "he would likely experience serious to major impairment in several areas." The ALJ didn't outright reject or ignore the evidence, as Mr. Miller suggests. On its face, the ALJ's decision considers the GAF scores in the record, so the court must go beyond the mere mention of the scores to decide whether the ALJ's analysis of Mr. Miller's mental residual functional capacity was adequate.

*Pre-Onset Symptoms*

For the pre-onset date symptoms, the ALJ referenced the treatment notes of Mark O. Carter, M.D. from May 2011 and Kelley Eshenaur, NP in October 2011. The ALJ noted that Mr. Miller reported hearing voices and having schizophrenia since he was a child, received psychiatric treatment from 2003 to 2004 and in 2006, and received treatment for attention deficit disorder and underwent an initial assessment for outpatient counseling services in 2011. Nevertheless, the ALJ said that just before his alleged onset date, Mr. Miller

was found to be oriented to person, place, and time, had a normal mood and affect, and his behavior, thought content, and judgment were normal. Mr. Miller highlights the contradictory April 2011 notes of Caryn Brown, Psy.D., HSPP who prepared a mental status consultative examination report for the Indiana Disability Determination Office, in which Mr. Miller reported that "he has a person, named Dave, that talks to him, tells him what to do, and comments on his actions[,] . . . . that these are not his thought[s,] and that the experience disturbs him." In the same assessment, Ms. Brown found that Mr. Miller was indeed oriented to person, place, and time and cooperative, but appeared irritable and his mood was flat. Ms. Brown commented that Mr. Miller's thought processes appeared logical and no evidence of hallucinations emerged during the assessment. Mr. Miller also references an October 2011 report compiled by Cami Antrim, MA, LMHC, LCAC in which Mr. Miller reported that "he has heard voices since age 5, although notes the intensity has increased in the past 2 years. Notes they can 'terrorize me' (lately) or comfort (past)." At this time, Mr. Miller was homeless and living out of his truck. Ms. Antrim rated Mr. Miller's thought content in the following categories: preoccupations – personal problems (financial concerns, homelessness, job problems); perceptions – auditory hallucinations; and delusions – within normal limits. She characterized Mr. Miller's mental health symptoms as "Severe/Acute" and gave him a GAF score of 48. The ALJ's conclusion that Mr. Miller's thought content was normal isn't supported by the evidence.

*Post-Onset Symptoms*

The ALJ said that after the alleged onset date, Mr. Miller had been down/depressed, his affect had been blunted/flat, and his insight had occasionally been poor. The ALJ further noted that Mr. Miller continued to complain of auditory hallucinations and admitted to being a chronic marijuana user. Nonetheless, the ALJ found that Mr. Miller had been cooperative, alert, oriented to person, place, and time, and his thought process had been logical and goal-directed. The ALJ concluded that Mr. Miller had demonstrated normal cognition and reasoning and intact judgment, memory, attention, and concentration. The ALJ considered the April 2012 state agency psychological consultant opinion of Ann Lovko, Ph.D. and the summary affirmation of that opinion by state agency psychological consultant Joelle J. Larsen, Ph.D. in June 2012. Dr. Lovko concluded, and Dr. Larsen agreed, that Mr. Miller was capable of performing semi-skilled tasks and capable of relating, on at least a superficial basis, with co-workers and supervisors on an ongoing basis. The ALJ noted that the consultants didn't have the opportunity to review later submitted evidence or hear Mr. Miller's testimony at the hearing. Consequently, the ALJ added limitations to the consultants' assessments and concluded that Mr. Miller could perform sedentary work with only superficial conduct with the public on routine matters and with only occasional co-worker contact and supervision.

Mr. Miller emphasizes the reports of Candice Hunter, M.D. who treated Mr. Miller in July and September 2012, after the state agency psychological consultants reviewed his treatment records.[1] On July 23, 2012, Mr. Miller reported: he heard "more voices now;" one guy/voice was usually helpful; he talked back to the voices; and he received special messages from TV, radio, and signs. The report noted a blunted affect, a logical, goal directed thought process, auditory hallucinations, and a GAF score of 50. On September 26, 2012, Mr. Miller reported that he was homeless and couldn't go to a shelter because he was uncomfortable being around a lot of people and the voices continued and most recently were singing.

The parties disagree about who had the burden to develop the record in light of the new evidence. The crux of whether the ALJ was required to obtain an updated medical opinion from a medical expert turns on whether the new evidence might cause the initial medical opinion to change. SSR-96-6P; Buckhanon ex rel. J.H. v. Astrue, 368 F. App'x 674, 679 (7th Cir. 2010). Mr. Miller's mental state seems to have deteriorated between the time the consultants reviewed his records and the hearing, but the notes are from a relatively short period of time and don't reveal a new diagnosis. *Cf.* Campbell v. Astrue, 627 F.3d 299, 309 (7th Cir. 2010) (new treatment records from a fifteen-month period that included additional diagnoses would affect a doctor's

---

[1] Mr. Miller referenced a third report dated October 2011. The state agency psychological consultants reviewed his treatment records in 2012, so this report was included in their analysis.

assessment of the claimant's mental functional capacity). It's not clear that the reports would change the consultants' opinions. The court also can't say the ALJ assumed the role of a doctor when he found the more recent evidence and Mr. Miller's testimony at the hearing warranted more restrictive limitations than those recommended by the consultants. *See* Harlin v. Astrue, 424 F. App'x 564, 568 (7th Cir. 2011) (ALJ improperly assumed the role of doctor to the extent the ALJ projected how a doctor would have testified had she seen the additional evidence); Richards v. Astrue, 370 F. App'x 727, 731 (7th Cir. 2010) (ALJ improperly applied limitations to areas that no medical professional had rated for the claimant). The ALJ, therefore, didn't have a duty to more fully develop the record, but the ALJ was required to build a logical bridge between the evidence and his conclusions. Jones v. Astrue, 623 F.3d 1155, 1160 (7th Cir. 2010). The court can't see how that bridge can stand. At the most recent appointments in the record, Mr. Miller reported getting special messages from TV, radio, and signs and hearing singing voices. He was homeless and wouldn't go to a shelter because he didn't like to be around a lot of people. The ALJ glossed over the auditory hallucinations and focused on Mr. Miller's normal cognition and reasoning and intact judgment. The new medical evidence doesn't support the ALJ's conclusions.

C. State Agency Psychological Consultants

At step three, the ALJ gave significant weight to the April 2012 state agency psychological consultant opinion of Ann Lovko, Ph.D. and the summary affirmation of that opinion by state agency psychological consultant Joelle J. Larsen, Ph.D. in June 2012. At step four, however, the ALJ gave little evidentiary weight to their opinions. The ALJ modified their assessments at step four to account for more recent evidence and Mr. Miller's testimony at the hearing. The ALJ doesn't explain why a similar modification wasn't also necessary at step three. The ALJ's inconsistent treatment of the state agency psychological consultant opinions at different steps in the evaluation process further weakens the logical bridge between the evidence and the ALJ's conclusions.

IV. CONCLUSION

The ALJ's decision isn't supported by substantial evidence and doesn't provide a logical bridge between the evidence and the ALJ's conclusions. <u>Jones v. Astrue</u>, 623 F.3d 1155, 1160 (7th Cir. 2010). The Commissioner's denial of benefits is REVERSED and this case is REMANDED with instructions to return the matter to the Social Security Administration for further proceeding consistent with this opinion.

SO ORDERED.

ENTERED: <u>September 25, 2014</u>

     /s/ Robert L. Miller, Jr.
Judge
United States District Court